on this afternoon's docket. Each is set for 20 minutes aside. We'll see if we need that much time. Council, you're familiar with our light system. Please be aware of it. When you see the red light come on, please finish your sentence and that will conclude your argument. The first case on the docket today is Case 24-30170, Seville Industries LLC v. United States Small Business Administration. We'll hear first from Mr. Allen. Thank you, Your Honor. And may it please the Court. Thomas Allen for Appellant Seville Industries. At its core, this case is a question of statutory interpretation, the meaning of the defined term payroll costs under Subsection 36A, Romanette 8 of the CARES Act. On April 7, 2020, Seville applied for a PPP loan based on a calculation of payroll costs that included payments to both its employees and its independent contractors. The lender and the Small Business Administration approved. Later, however, the SBA denied forgiveness of the full loan amount on the rationale that payments to independent contractors don't count for purposes of the payroll calculation. The District Court agreed, but these payments do count as both the plain language and the statutory context confirm. So I'd like to begin as we must with the text of the statute, mindful of first principles. To ascertain the plain meaning of a statute, we look to the particular statutory language at issue as well as the language and design of the statute as a whole, and we ask, what does this language mean to an ordinary reader? Not to lawyers who read statutes for a living, but to a business struggling to survive at the onset of the global pandemic. The first statutory provision is the one primarily at issue here, the definition of payroll costs. This language is unambiguous and straightforward. It is a definitional provision that states that the term payroll costs means two categories which are linked by the word and. Subpart AA discusses the sum of payments of any compensation with respect to employees, and then the statute contains and, and then subpart BB, the sum of payments of any compensation to or income of a sole proprietor or independent contractor. It is axiomatic that the word and combines elements together. It does not create alternatives. Well, it could create conjunctive categories, I guess. Yes, Your Honor. I mean, I guess the problem I've got, it may go to context, it may go to the actual text of the statute, but your reading means that a business could have applied for a loan for employee payroll costs as enumerated in AA, as well as whatever it was paying to its independent contractors. The sole proprietorship thing doesn't make any sense to the extent that I, I don't know that, well, maybe the business is paying a sole proprietor also, but, but then when the same independent contractor who is clearly by the rest of the statute entitled to seek loan also, the independent contractor is precluded from doing so. I mean, to me, that's not an ordinary reading of the statutory framework. Well, Your Honor, I, I think that, that goes to the concern that the district court expressed about double dipping, where you might have a . . . Well, not even double dipping, but precluding an independent contractor from recovering its costs and expenses because one of the businesses that employed the, the independent contractor already did so. Well, I, Your Honor, that's the scenario that I, I believe Congress envisioned when it drafted Subpart BB because Subpart BB is broader than SBA has suggested. It contemplates two scenarios where the independent contractor is the borrower or where, as in our case, the business paying independent contractors is the borrower. Our case, the latter scenario, is the one contemplated by the language, the sum of payments to a sole proprietor or independent contractor. This mirrors the language . . . There's another problem, I guess, that's directly text, not context. It talks about the business' employees. Why does the statute then refer to a sole, a sole proprietor or a independent contractor, as opposed to all the ones the business would have hired? Well, I, I, I would interpret that language to contemplate the scenario in which the independent contractor is the borrower, but as we know from the Dictionary Act and elsewhere, the singular can include the plural, and in this case, there were numerous contractors to whom we paid. It, it may be, we don't know, but it may be that Congress, when it wrote that, decided to use the singular to signal and, and be consistent with the, the increased eligibility for independent contractors, but the, the fact remains that Congress used this for construction in subpart BB, and, and, and if, if Congress had only intended, as SBA suggests, that only independent contractors are eligible to receive PPP loans, but that businesses like Seville could not pay their independent contractors, then BB could be shorter. BB would have been shorter. It would have talked about the sum of payments of any income of the sole proprietor or independent contractor, but BB was drafted more broadly to use the same structure, roughly, as AA, using, contemplating payment, compensation to a sole proprietor or independent contractor. In that construction, the sole proprietor or independent contractor is the direct object. Payments to, by the lender. The, the SBA's interpretation wants to narrow this provision and say that in context, we're only talking about income of independent contractors when they are the lender. Well, but under your reading, if I have it right, Seville gets reimbursed for whatever it paid to independent contractor X, Y, and Z, but X, Y, and Z each have 10 or 20 or 50 clients for which they work, right? So, where is the support in the statute that the independent contractor has to discern where it's, where, where loans have been requested and where loans have not been requested? In other words, an independent contractor then can't apply for 100% of its income. It's got to figure out, well, the, the, the, the unclaimed income. Well, doesn't that overly complicate things? Well, it, complicated or not, I do believe the statute contemplates this scenario, and we've discussed the certification provision in subsection 36G, which requires an applicant for a PPP loan to certify that the loan, the loan is not duplicative of amounts applied for or received under a covered loan. Not the applicant's covered loan, a covered loan. It is, by design, a broad certification. Now, in a, how does that work in practice? Do independent contra, during the short period in which PPP loans were available, were independent contractors required to communicate with the, the companies for whom they worked? Well, it would probably be a good idea, but the, the statute, and, and, but, but implementation of that, I would suggest is largely the province of SBA who is charged with administering the PPP loan process. The SBA promulgated the loan application forms, and, which we discuss in our briefs, expressly discuss payments to independent contractors as a basis for eligibility to find, to, to get these loans. Now, if there was another aspect, and, and to, to make the, the, the loan application form more workable, then that is SBA's responsibility, but certainly it's not on the borrowers to solve the administrability questions for the agency. Let me ask you what happened. Yes, Judge. What exactly did SBA know when the loan was filed? Did Seville identify the number of independent contractors that paid? I don't believe. Should have known whether they were aware of payroll costs, how they were calculated? What did SBA know? Well, the, the loan application form, which is in the, the record, it, it, it's around page 604, 605 of the record on appeal. It does not ask for the number of independent contractors. It asks for the number of employees, which Seville calculated using, let's say, number 53 was the number. They did identify that they had paid independent lender loan calculator, and the, and just like with other Section 7 loans under the, under the SBA, the lenders administer them, and then they are guaranteed and approved by the SBA. So the lender knew. I don't think there's any dispute. The lender knew. Has that information for the lender? That's, SBA certainly had that information when, on the statute, when Seville applied for its loan, I mean, applied for full forgiveness of its loan, which is one of the main reasons anyone would have taken these loans out to begin with. No one would have taken these loans out had they known that they would perhaps be faced with a calamitous loan liability simply when they were trying to keep their heads above water. Well, but they got reimbursed for their employees. They did, Your Honor. The employees, I mean, as I understand the whole purpose of the act, and I'm trying to separate the case from what I remember when this was happening, the whole idea was to keep employees employed, whereas with an independent contractor, sole proprietorship, again, if they're even related to a business, another business, I mean, you, the, the employer or the business like Seville could just cut its independent contractors loose and leave them to sort of fend for themselves. In other words, the purpose of the statute was employees, not independent contractors. Your Honor, I believe that the purpose of the statute was to keep workers working. Well, workers working, but basically by Seville's applying for the loan to cover its independent contractors, it's depriving the independent contractor's ability to keep its workers working. Well, um, I mean, how does that make sense? Simply as a factual matter here, uh, Seville's contractors were, were people, were individuals. Uh, they're periodic workers, some of whom, uh, didn't earn much, some of whom had larger compensation. Uh, the administrative record. Did they have other clients? That's not in the, uh, record, Your Honor. Um, and I don't know the answer to that. How much of the original loan was paid to compensate the independent contractors versus the employees? Seville did not pay, uh, uh, anything toward payments of independent contractors. And, and it paid, it, but there is no dispute that Seville's, uh, use of the loan proceeds was absolutely proper. What did it do with the, with the Delta? So some hundreds of thousands of dollars of the loan was predicated on money earned by contractors in the pre previous year. What did it do with that money? The, the, the, the expenditure of the funds, uh, as the record makes clear, was spent on employee payroll, mortgage, rent, utilities, all permissible uses of the loan proceeds. And SBA has never suggested that Seville did anything wrong with how it used the money. There has never been any suggestion that Seville did anything wrong on the front end when it applied for this loan. Uh, it's, it's undisputed that Seville used the, the, the loan calculator from the lender to include the payments to its independent contractors. And it was only later when it sought forgiveness that suddenly it, it was faced with the prospect of, of having an enormous Delta between the loan, the original loan amount and the, uh, the amount to be reimbursed. Um, so in that Delta is, is almost $2 million. So it's 2.5 was the original 2.6 was the original loan and you got back 600. It's the original amount was a little over 2.5. The amount that we were reimbursed was around 687,000. We note in our brief that there is a, there was along the way it was determined that there was a miscalculation of the loan amount. So the total loan amount that we should have gotten and the, the, the difference between that amount and what we got received would be smaller. The loan amount should have been 2.1 million and that's, that was raised with the district court and is in our briefs. So, so it's the difference between 2.1 million and 680, 687,000 and change. But the position of Seville is that you can get a payroll loan predicated on the earnings or payments to independent contractors from the previous year, but then not pay the independent contractors anything with the loan proceeds. Well, it's, it's not clear from the record, you know, how everything shook out in the year of COVID. Um, and, uh, but I thought you said that you paid $0 to the independent. Well, that's no, that's, that's true. That's true. I'm just referring to what happened during the life of the business during that time. Uh, it's undisputed that the payments were made to, for employee payroll, uh, mortgage utilities, rent, uh, all permissible uses of the statute. Um, and, and there's never been any suggestion that there was anything improper about that. But when putting all that aside though, doesn't this feed into what is the proper interpretation of not the statute, but 636, 836, a Roman at eight. It's payroll cost. I don't see overhead. I don't see warehouse or rent or anything like that in the enumeration of little AA. Um, I see payroll cost. Well, the same thing, same thing in BB. Well, payroll costs and the payments to independent contractors, sole proprietors, et cetera, or income thereof. That is the basis that Congress chose to, uh, that was the value Congress shows when it allowed people to calculate their, their payroll amounts. And then over the course of the implementation of the PPP program, there were, um, as I understand it, some changes about the percentage of the loan amounts that, uh, uh, a business had to, to pay back on, uh, for, for payroll costs. But, um, but I, I, I'm glad Judge Wilson, you referred to the text because there is a, a, a portion of the text that I think gets lost a little bit and, and needs to be remembered. And that's section 636 F Roman at two. It talks about the considerations, um, by the lender for eligibility for these loans. And it says the lender shall consider whether the borrower was in operation on the operative date and then whether it paid, uh, uh, employees or paid independent contractors as reported on a Form 1099 MISC. If the SBA is right and payments to independent contractors by the borrower are irrelevant and don't count, why would Congress have put this in here? Why would Congress have predicated eligibility for PPP loans on the payment to, payments to independent contractors by the borrower and yet later say, oh, well, those, those are, uh, those are irrelevant. Those don't matter for purposes of your payroll costs. SBA's position cannot be reconciled with this provision. And I ask you a question on whether you're right. So suppose your reading is right and that the independent contractors do matter for the, and let's make this super simple. Let's just say you have a hundred independent contractors, no employees. Yes. So you're just applying under BB. You get a $2 million PPP loan predicated on, on payroll costs to a hundred independent contractors. You then fire all of them and just use it to pay for mortgage under your theory. That's totally permissible under the CARES Act, right? Well, did you follow the hypo? I do, Your Honor. And, um, fortunately that's not our scenario, but I could do it if, if the borrower, uh, actually I don't think that's true because you would have to spend, uh, X percentage on, uh, on, you know, payroll costs themselves. But that goes to a question of whether the borrower is properly spending the money. And there are provisions in the statute that talk about permissible uses of the loan proceeds. So, um, that question would really go to how, did they, did they spend the money correctly or did they not? As opposed to whether they were eligible for the loan to begin with and whether they properly calculated the amount. So what do we do with, uh, the SBA's interpretation of the statute? It goes against you. The district court applied Chevron. What do we do with that? Well, Chevron doesn't apply. Do we send it back to the district court and remand or do we make the decision ourselves? I, I think the court, uh, can, both, both options would be available to the court. I would submit that, that it's not necessary to send it back to the district court because even though the district court invoked Chevron, uh, it really went through a textual analysis and this court can examine the text and determine what is the best reading. But we also consider what the agency's reading is, right? Uh, yes, Your Honor, it's sort of a Skidmore, uh, deference. Um, uh, Skidmore is still on the books. It's unclear, um, as I think a recent opinion, um, uh, from Chief Judge Elrod, uh, discussed about what, what effect Skidmore has anymore. Either there is a, a best reading and the agency is right or the agency is wrong and there's no deference and no, uh, uh, consideration given to that reading. So I, I think I would urge the court to apply the words as written on the, on the, uh, on the statute. I have, uh, three minutes to rebuttal. Thank you. Thank you, counsel. Um, next we'll hear from Mr. Jedd, the government. Good afternoon, Your Honors. Adam Jedd on behalf of the United States and may it please the court. I think as a number of the questions that the court asked my friend, uh, today illustrate, this is a complex statute with a number of interacting provisions. Now, even if I just had the text of section BB, as we point out, we think just the term payment of compensation in a vacuum could indicate the giving or the receipt. If I just had the text of BB, I would also have the singular and plural argument. I would also have the BB structure. But there are so many other interacting provisions of the statute that presuppose that what a small business can do when counting its payroll costs are its payments to employees. It has to document the number of employees, not the number of independent contractors or sole proprietors. It's to document the amount that it paid to its employees or certify not independent contractors or sole proprietors. There are limits, uh, when it's time to get loan forgiveness on how much it could reduce the amount that it paid to employees or the number of employees that it had, not to independent contractors or sole proprietors. And indeed, it appears that in this very case, what happened was that the plaintiff looked to past payments to independent contractors in order to get a loan and then didn't use any of those loan proceeds to support independent contractors. Now, they may well have used the loan proceeds on permissible expenses, such as rent or utilities, but it would be anomalous if it could look to both categories of past expenses. But then when it was time to figure out whether loan forgiveness should be reduced, then only one of those categories of past expenses mattered. And there are, the anomalies go on and on. Counsel, before we get to, um, um, could imagine a company that just had 10 independent contractors. Can it, can it get a payroll loan on behalf of the, uh, for the 1099 missed payments from the year before for just those 10? Um, so that the answer Judge Oldham is somewhat nuanced and it depends on some kind of timing details in the statute. Um, so what my friend is pointing to when he talks about that 1099 provision on form 2483, and I just want to point out, by the way, he seems to have relied on the form quite a bit. I think the statutory argument may be a little bit new at the podium today. Um, what he's pointing to is that provision that talks about eligibility for loans and, you know, to the extent that the court wants to consider that there are a few responses to that concern. Um, so the first is if nothing else, that provision can't help him because at most all it mentions is independent contractors, not sole proprietors. So unless my friend has some theory for why it is that he's going to, I guess, within BB, somehow treat independent contractors differently than sole proprietors, then it can't actually be doing any work for him. Um, I, I think Judge Oldham, what's happening there, the reason that provision exists is it's about eligibility to be able to get a loan and what it's basically asking is kind of were you in business? So there are kind of two parts of the test. One part is just literally where you set up and then the second part, do you have employees or do you have independent contractors? The, the function of that is kind of to address like a shell corporation. If someone had incorporated a company but it just didn't have anyone, um, then they wouldn't be eligible for a loan and maybe just to, to sort of further tease out the details, Judge Oldham, if you had someone who at the time that they applied for a loan only had independent contractors and also during the relevant period where you look to your payroll costs, then they wouldn't be able to get a loan because, I mean, this may be just sort of an empty formality but their payroll costs would be zero and so if you kind of ran it through the formula, the amount that they would end up with would be zero. But you could have someone who at that time, it's the, the sort of trigger date in the statute was February 15th, on February 15th had independent contractors but not employees but nonetheless would have payroll costs and there may be kind of three categories in which that could happen. One is if you just had a sole proprietor, as we pointed out in our brief, a sole proprietor, um, can, uh, can get compensation obviously for themselves, can get compensation for sort of payments it's made to others, so if it had an independent contractor it would be eligible and then would be looking to essentially the payroll costs being directed at itself. Um, this can also come up for something like seasonal employees, so maybe just to give a kind of concrete example. Imagine if you have a small business that harvests Christmas trees, um, and so, you know, last September, October, November, December they had many employees on the books who were harvesting Christmas trees. Now it's February, they don't have those employees on the books anymore but they're still eligible if they have, just again, you know, to sort of chase down this example, if for example they were like paying an accountant who is an independent contractor to, you know, kind of follow up on the bills from the Christmas trees that they sold last year, they could then look to that prior year's payroll to sort of set up their costs, so they would have payroll costs even though at that moment all that they have is independent contractors. And then the third category would be new businesses. Um, if your honor takes a look at 636, apologies these sites are all very long, 636A36Eiiiii, little double A, big double A, um, this concerns how you do payroll costs for a new business, um, and basically if you have a new business that has been set up, the sort of relevant time period can stretch past February 15th, so all of that is just to say, apologies for the length of this answer, Judge Oldham, um, that on that trigger date you could just have an independent contractor, it shows that you're not a shell corporation, they're actually doing something, but it may be that your payroll costs end up not being zero. Right, so you, but I guess the point is that you could be in a situation under some set of theories where you're going to have both employees and independent contractors both contributing to a payroll calculus. Nuanced or not, like there, there, these aren't hermetically sealed categories, right, so there are ways, and we can think of presumably others, we could, maybe if you want to stick with the Christmas tree hypothetical, you could imagine each one of the workers who's harvesting Christmas trees, selling the Christmas trees in the lot, loading the Christmas trees in the trucks, those people could all be independent contractors, presumably with payroll costs. Those would presumably count for the payroll, for the, um, the payroll calculation, probably in this, in this section, but you could also have full-time employees, either owners of the business or whatever. Right. I'm, I'm, I apologize. No, please. Oh, I'm, I'm not sure if I'm understanding your Honor's question. Um, if, I guess to sort of continue to chase down this, uh, Christmas tree example, if the individuals who are harvesting Christmas trees are employees, um, they would be counted towards the, you know, Christmas tree farm's payroll costs, the Christmas tree farm would have to document the number of tree harvesters, would have to document the amount given to tree harvesters, and then its loan forgiveness in the future would be reduced if it did not, you know, hire a similar number at sort of similar cost tree harvesters. If the tree harvesters were independent contractors or the Christmas tree farm went out and hired like a one-person sole proprietorship that among other things comes in and, you know, provides services, whether it's regular services like cutting down trees or maybe just came in to, you know, fix the heater in the field once or something like that. Um, the, our hypothetical Christmas tree farm could not count those as payroll costs, but that sole proprietorship or those independent contractors could get their own loans and could then obviously base that loan on what they had been paid in the prior year, including by our hypothetical Christmas tree farm, and I think Judge Wilson asked a question that got at this as well. Any of the other number of businesses, small or large, that they had done business with the year prior? I presume this isn't the only case where there's, had this sort of confusion about payroll costs. Can you estimate how many other loan applications that the SBA received where the applicant calculated payroll costs using payments to employees as well as to independent contractors? I don't, Your Honor. All that I can tell you is I know that there was a recent district court decision on the same issue that also ruled for the government, but, you know, I don't know what the universe of this is. What I can tell you, and this was the sort of statutory design, is basically a lot of money went out very quickly, and it was based on self-certification, and so I think it's kind of common ground that obviously there was money that went out the door that should not have gone out the door. You know, it may have been a mistake, may have been negligent, may have been fraudulent, who knows, but there was certainly more money out the door than should have been going out the door. Now that it's sort of loan forgiveness time, basically, there's a process. Obviously, some of these things are being caught quickly. There are kind of further audits that are going to go on in order to sort of catch more of this. Judge Clement, what I should say is kind of to the extent that my friend stood up here and said kind of this was so unfair, we were somehow misled, or, you know, we didn't know what was going on. I mean, one, obviously the tail can't wet the dog. That doesn't shed light on the statutory question. At best, that just goes to my friend's equitable estoppel argument, which we think is kind of just over-determined for a number of reasons, but I do just want to say as a factual matter, to the extent that he's saying this was unfair and we didn't know what was going on, if I point your honors to ROA 605, that's the actual loan application. That loan application itself explained that they can't count, that a business cannot count independent contractors in its payroll, and if you look at ROA 678, this is the promissory note that my friend's client signed on April 17th, so even to the extent that there's some dispute about when the relevant interpretation was, quote, issued, I think there's a sort of fight about its publication date, purchase and posting date. April 15th, it's in the Federal Register, and if you look at ROA 678, among other things, it says, by the way, any representation being made by this private lender is qualified by and subject to these regulations that are out there. So, you know, look, obviously I'm not here to attribute any motive. It may well be that the plaintiff just misunderstood, notwithstanding the various language in the application form and the promissory note, but, you know, even setting those aside, obviously, if you do business with the government, you are obligated to, you know, know what the law is, and that's . . . I don't think the SBA should know what the law is. Well, Judge Clement, I think the SBA did know what the law is. They let these loans go out, and they didn't follow up as to whether they included payment to independent contractors. Well, Judge Clement, SBA was not issuing the loans. There were private lenders that were issuing the loans in a . . . Yes, in a tremendous amount. Obviously, SBA was, you know, sort of simultaneously doing a whole lot of things at the beginning of the pandemic. So, obviously, they weren't able to, you know, sort of audit each and every loan application the moment that it was going out, and actually, among other things, Congress at some point in June of 2020, if I recall, SBA set up a kind of system for further review, and Congress stepped in and set, among other things, for smaller-sized loans, not applicable to this case, but just for smaller-sized loans. At least on the front end, you've got to rely on certifications, and then it's just kind of later on that you can continue to delve into that. But, again, Judge Clement, I mean, this is just sort of black-letter law as to their equitable estoppel argument. Among other things, if they've got the meaning of the statute wrong, and the statute concerns money going out the door, then equitable estoppel, even if it could ever apply against the government, just can't apply here. They are obligated to parse the statute, parse the regulations. In fact, actually, one of the Supreme Court cases that we cite even relies on an agency manual that was out there. Clearly, they did not do that either. And, I mean, you know, look, if at the end of the day, what happened was they got a much larger loan at a rate of 1 percent for a number of years than they were entitled to, you know, I appreciate, of course, that in an ideal world, they would like to have known that on the front end, but that's still, in some sense, not a tremendous harm. I'm less, oh, I'm sorry, sorry, one other question about all this. From the SBA's perspective, take an employer that has two employees, two independent contractors. When the CARES Act goes into place, the employer's hammered, totally, you know, payroll goes to zero, needs emergency funding, applies. Is the view of the SBA that what that employer should do is get a CARES loan for the two employees, keep them on, keep them working, fire the two independent contractors immediately, and let them just sort of fend for themselves with the federal government? Is that kind of, I don't mean to, it sounds argumentative, I don't mean it to be, I'm just trying to simplify what is a complex scheme to make sure I understand the dichotomy. Sure, Judge Oldham, I, obviously, I understand what your question is getting at. I don't know that SBA, I mean, here we're just interpreting the statute, so that's separate from SBA's views, and I don't know that SBA has any specific views on how a business should have been managing its, you know, particular circumstances in the beginning of the pandemic, but I think what your Honor's question is getting at is, yes, I think that the payroll cost calculation for that business would be based on the number of employees that it had. Those independent contractors could then potentially apply for its own loans. And, you know, obviously the tail can't wag the dog, I mean, to the extent that you might think in the hypothetical that your Honor gave, well, maybe those independent contractors are sort of functioning a lot like employees, maybe it's as if they're all kind of, you know, sitting at the same desk doing the same thing. Nonetheless, I mean, just one, in law in general, independent contractors are often treated differently from employees, but two, this is the tail can't wag the dog point. Their argument has to be equally true of an independent contractor or sole proprietor who, you know, once, last February, came in to fix the broken boiler and has never had any contact with this business again, and obviously, you know, for a company like that, then they could apply for their own loans. And, you know, I'm not quite sure of my friend's position on whether then you get the PPP double accounting problem, or if my friend is saying there is no PPP double accounting problem, to the extent that he has a solution to it, and as we point out, that's just a misreading of the statutory text, but even if he did have a solution to that, you would then get a situation where, again, Judge Oldham, to go back to your example, you might have a business that's getting a loan based on what it previously paid to, even just that person who came in to fix the boiler once last year, and now suddenly that person who came in to fix the boiler once last year, again, if somehow there were perfect information, and they all knew that each other had gotten a loan, and given the speed of this, they all knew kind of what loan got issued first, it's hard to know how that would even be possible, but if somehow that did happen, then that sole proprietor or independent contractor would not be able to get a loan, even though they had no ongoing support, whereas this hypothetical small business could point to that past payment, get a loan, and then would not have to continue to, you know, ever interact with this independent contractor again, in contrast to its employees. Last question on this, and I promise I want to make sure you have time for whatever else you want to talk about. Given that the loan agreement says you can't count the independent contractors, why do we even get to any of the statutory questions? Is it not like a standing problem or some sort of, like, threshold problem? If I sign up for a loan with a private bank, I get it, SBA standing in the background guaranteeing the loans, but if I'm entering into a contract with a private bank and I say, look, I'd like a loan, I'd like it at 1%, I'd like it for whatever the term was, for a million dollars, and I recognize that I'm not allowed to count my independent contractors, then the statutory schemes, it all sort of feeds into the background of this case, does it not? Yeah, so I mean, I guess what I'd say is, you know, in your hypothetical, if you're just having a dispute with a private bank, presumably you just have a contract dispute. Obviously what we have here is there was an administrative loan forgiveness decision by the agency that's subject to an APA suit. You know, I think your honors question gets to the point of, could the agency theoretically have said, look, you were on notice of this in the loan application, there was some language about the regs and the promissory note, and so consequently maybe you've somehow kind of forfeited or otherwise waived these arguments? Maybe it could have said that, but obviously that's just not what the agency said, and so, you know, we're here defending the decision that the agency made. Judge Oldham, I should say, I think your question gets to a very interesting point, which is, obviously we don't want a situation where people apply for loans in violation of applicable regulations at the expense of others who maybe actually read the regulations and complied with them and what everyone was trying to get, what were a very limited set of funds, didn't get them, and then be able to sort of come in on the back end and say, well, aha, that regulation was somehow invalid. I think that would be a very serious issue when it comes to rules that are legislative rules, but, you know, again, obviously for our purposes, our view is that the agency's rule was just interpretive. All it was saying is this is what the statute means, and so that's why at least as the case comes to this Court, the sole question is what the statute means. And unless the Court has any other questions, I'm happy to rest on my briefs. Thank you. Thank you, Your Honors. Mr. Allen, you have three minutes for rebuttal. Thank you, Your Honor. Briefly, I would submit it's important to remember SBA's position is that payments to independent contractors by the borrower can never count, that they are hermetically sealed categories. But the language of the statute and the language in their loan agreement or the loan application belies this contention. Mr. Jedd referenced the loan agreement. The loan agreement asks the applicant to certify that it had employees for whom it paid salaries and payroll taxes or paid independent contractors as reported on a form MISC. Again, if these are hermetically sealed categories and never the twain shall meet, why is eligibility premised on the lender or the borrower making these payments? That is a different scenario than the borrower being the independent contractor itself. And that mirrors the language in the statute that I discussed a moment ago. The other, Judge Oldham, your question about the seasonal employees and the Christmas tree farm, the answer was very complicated, and by no fault of opposing counsel, that it is complicated. And I would submit that the complexity of that answer goes to one of the first principles that we talked about. How is an ordinary reader supposed to understand this? It is undisputed that Seville, when it asked for this loan, applied the ordinary reading of the parts AA and BB, the definition of payroll costs, and it added those two items together. And when we are considering the meaning of a statute, we must always consider how is that going to be interpreted by the ordinary person. There was a discussion about the rule. I would submit simply that the rule is irrelevant. The rule was not in effect by its own terms until April 15th, eight days after the loan was submitted, and really the discussion of the rule rises or falls on what does the statute mean. It wasn't in effect, but it was published. It was published? It was pending. It was, and by its own terms, it said this will be in effect on April 15th. But you've got that, you've got the loan application, you've got all these other things. The loan application. Seville just sort of blew through. The loan, I respectfully disagree, Your Honor. The loan application itself says the applicant is eligible to receive a loan under the rules in effect at the time this application is submitted. On April 7th, when the application was submitted, that rule was not in effect. So I would simply submit that this is ultimately a question of statutory interpretation. I would leave the Court with the words of the Supreme Court, only the words on the page constitute the law adopted by Congress and approved by the President. We ask this Court to apply the words on the page and reverse the rulings below that denied Seville's full loan forgiveness amount. Thank you, Counsel. Thank you, Your Honor. The case is submitted.